entered into communication with the bondsman, and finally, in the middle of June, with the co-operation of the bondsman, he uncovered Kaufer and then arrested him.

The neglect of duty lay, apparently, in his failure to interview the landlord of the premises 23 Avenue B. The landlord did not live at that address. The relator did not call upon the landlord, but he did talk with the janitress, and the janitress usually, in the words of Lieutenant Judge, "would be the best person to get the information from." Janitors usually let the apartments, and are on more or less intimate terms with the tenants. In this instance the janitress rented the apartment to Kaufer, collected the rent from him, and introduced him to the landlord. It was the relator's misfortune, however, that during the time intervening between the letting and his quest the janitress had gone to Europe, and her place was taken by one who knew Kaufer only as Schmidtwick. As Schmidtwick he was known in the neighborhood, and that doubtless accounts for the relator's inability to find him.

There was not a suggestion of evidence tending to show that the relator had not acted in the utmost good faith. He had borne a good reputation in the department. As a detective he had performed his duties properly. To most people it would seem that in this particular instance he had done his duty honestly and intelligently. It is undeniable that he performed it with ultimate success; but because he did not make the arrest with a promptness sufficient to satisfy the exacting mind of some official superior, and because, although he made diligent effort in all other respects, he failed to seek information from the one person who, unknown to him, was in a position to enlighten him, he was dismissed the service. We think he was not justly dismissed. Unless a failure to act infallibly can be pronounced neglect, there was nothing that warranted the drastic action of the commissioner. The highest standard of conduct and efficiency is exacted from police officers in the city of New York by comprehensive and sometimes complicated rules, but not until this case have the governing authorities attempted to exact infallibility.

The determination of the police commissioner should be annulled, and the relator reinstated, with $50 costs and disbursements. All concur.

---

### In re SENFF'S WILL.

(Supreme Court, Appellate Division, Second Department. July 31, 1914.)

WILLS (§ 155*)—PROBATE OF CODICIL—PROOF.

　　Where, on the probate of a codicil to a will, the evidence clearly showed the genuineness of the codicil, the validity of its execution, and the competency of testator, and that he was neither restrained nor unduly influenced, the codicil was properly admitted to probate, though it bequeathed a large legacy to one not a natural object of testator's bounty, and such beneficiary caused the physical preparation of the codicil, procured the attendance of the witnesses, and retained the executed instru-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ment in his possession, and though he and testator kept secret the circumstances of its execution and the knowledge of its contents.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

Appeal from Surrogate's Court, Queens County.

In the matter of proving a codicil to the last will and testament of Charles H. Senff, deceased. Probate of the codicil was sought by Effingham Lawrence and contested by Frederick W. Senff and others. From a decree for proponent, contestants appeal. Affirmed.

Argued before JENKS, P. J., and BURR, CARR, STAPLETON, and PUTNAM, JJ.

Austen G. Fox, of New York City (Theodore De Witt, of New York City, on the brief), for appellant Frederick W. Senff.

Bronson Winthrop, of New York City (George Roberts, of New York City, on the brief), for appellant Gustavia A. Senff.

William F. Ryan, of Jamaica (Henry C. Frey, of Jamaica, on the brief), for appellant Jeffreys.

Martin W. Littleton, of New York City (John M. Bowers and John W. Weed, both of New York City, on the brief), for respondent.

STAPLETON, J. Charles H. Senff died on the 23d day of August, 1911, leaving a will that he published on June 18, 1888. That will was admitted to probate on the 29th day of September, 1911. The value of his estate was approximately $10,000,000. On October 27, 1910, Effingham Lawrence, the respondent herein, caused a form of codicil to be prepared, with the testator's name left blank in the body thereof. On November 1, 1910, while the testator was suffering from progressive pernicious anæmia, Lawrence, accompanied by his wife and chauffeur, and presumably with the form of codicil in his pocket, called at Mr. Senff's home. At that visit Mr. Senff personally filled in the blank and signed and published the codicil. The witnesses were Lawrence's wife and his chauffeur. Lawrence was the only other person present. Lawrence took possession of the signed and attested codicil, and retained it in his possession until the petition for probate was filed on the 13th day of November, 1911. The codicil by its terms gave to Lawrence an indebtedness of $635,000 that was owing by Lawrence to Senff at the time of the latter's death. By the terms of the will the property of Mr. Senff was devised and bequeathed to his widow for life, with remainder to collateral relatives. There was no issue surviving. The widow, executors, and collateral relatives contested in the proceeding for the probate of the codicil. The learned surrogate sustained the codicil as the free act of a competent testator, and from the decree entered upon that decision this appeal is taken.

There was evidence that at the time he signed the codicil Mr. Senff was suffering from cerebral lesions and lesions of the spinal cord; that he had so suffered from 13 months preceding the act of signing, and that his condition indicated progressive paralysis, the symptoms of which were, however, not marked until October, 1910, the month

preceding the signing. A medical witness, who had attended him professionally, testified that he was mentally incompetent to sign the codicil; but this same witness was unable to call to mind one single act, deed, word, or expression that was indicative of insanity or mental unsoundness.

McVeigh, a nephew of Mrs. Senff, testified that at times in the fall of 1910 he found the testator crying and laughing and sobbing. He would laugh inordinately at a story. He had some lapses of memory.

Mrs. McVeigh, the sister of Mrs. Senff, testified to Mr. Senff's physical deterioration in the fall of 1910. He was tired and restless. He showed failure of memory. He failed to greet her, and when she greeted him he cried. He became easily fatigued and was hysterical. He became obsessed with the fear that a picture and the bulb of an electric fixture would fall upon him, and he had them removed. Noise and light affected him uncomfortably.

Wallace, a relative, observed, in 1910 and 1911, a moderating of the testator's dominant personality, a diminution in the usual interest that he had shown in his estate, a loss of memory and confessions of loss of memory, and a tendency to doze.

There was other evidence of loss of memory, lack of continuity of thought, and lack of interest.

On behalf of the proponent there was evidence that the testator, up almost to the time of his death, kept, either personally or by entries made under his personal direction, an accurate account of his intricate, large and multiplex transactions, and that, with neighbors and friends, he discoursed rationally and interestingly on current topics, and particularly on matters relating to farming, which, apparently, he had made a hobby.

Mrs. Janet N. Lawrence, the mother of the respondent, described the long friendship existing between the Senff and Lawrence families, originating between Mr. Senff and the grandfather of the beneficiary at the old Lawrence homestead in Louisiana, interrupted for a period, renewed many years afterwards at Whitestone, Long Island, and continued uninterruptedly thereafter, with frequent exchanges of · visits, until the testator's death. She testified to the deep interest of Mr. Senff in the younger Lawrence, as child and man, and of his substantial aid evidenced by the advancement, without security, of various sums ranging in amount from $25,000 to $500,000.

There was evidence to show that at the time of the publishing of the codicil the testator spoke and acted rationally.

Promissory notes evidencing the indebtedness of Lawrence, known to have had existence, were not produced on the hearing by the legal representatives of the deceased.

The benefaction was large, the transaction was clandestine, the conduct of the testator and the beneficiary, relating to the execution of the codicil, was unusual; but the testator was an extraordinary man. He was mentally sound, immensely wealthy, and peculiarly masterful. It is demonstrated that he knew precisely the value of his estate, and that he amply provided for the natural objects of his bounty. When unquestionably in full physical and mental vigor, his treatment of the

beneficiary was remarkably generous, and his concern for the beneficiary's material advancement romantically solicitous. His transactions with Lawrence were not attended with any of the ordinary safeguards of business. A search for the motive which actuated him in making the bequest and in pursuing the method by which he made it (if indeed there was a motive other than one of disinterested friendship) would end in fruitless and needless speculation. The safe presumption is that he intended the natural consequences of his act.

There was sufficient evidence to warrant the surrogate in determining the genuineness of the codicil, the validity of its execution, and the competency of the testator to make it. There was evidence which clearly proved that at the time of the making the testator was neither restrained nor unduly influenced. The law requires nothing more in a proceeding to probate, notwithstanding that the beneficiary, who is not a natural object of the testator's bounty, and is by the terms of the instrument bequeathed a large legacy, caused the physical preparation of the testament, procured the attendance of the witnesses, retained possession of the executed instrument, and that he and the testator kept secret the circumstance of the execution of the codicil and the knowledge of its contents.

It is hardly needful to allude to the revocable quality of the instrument and the long time that elapsed between its making and the death of the testator, during which revocation could have been made by Mr. Senff, free from any possibility of Lawrence's influence or control.

I advise affirmance of the decree.

Decree of the Surrogate's Court of Queens County affirmed, with costs to the respondent, payable out of the estate. All concur.